Please call the next case. Those who are going to argue, please step up to the podium and introduce yourselves. Good morning, Your Honor. My name is Ron Menneker. I represent the Appellant Christopher Cooper. Good morning, Justice. This is Assistant State's Attorney Coolifornia on behalf of the people. Thank you. Appellant, please reserve from your 15 minutes whatever portion you'd like for rebuttal. Thank you, Your Honor. I have raised, or Mr. Cooper has raised a number of issues in his brief. I would like to address two of those issues. I'd like to address on the one hand the ineffective assistance of counsel argument, particularly as it applied to the pretrial motion that suppresses confession. And I would also like to address the disability of evidence of abortion. Obviously, if the Court has any questions regarding these issues or any of the other issues I've raised, I'd be more than happy to address those as well. Let me begin, if I might, with the ineffective assistance of counsel argument. I think if there's any one thing that my colleague and I probably agree upon, it is the pivotal role that a confession plays in a criminal prosecution. That was, I think, illustrated in a case that I cited in Mr. Cooper's brief, People v. R.C. In R.C., our Supreme Court said, a confession is the most powerful piece of evidence that the prosecution can offer. And then they went on to say that its effect on a jury is almost incalculable. In this case, well in advance of and prior to filing a motion to suppress, trial counsel had been provided a multitude of records involving the defendant's background. These records were academic records. He was provided with medical records. He was provided with records of background records of Mr. Cooper. The contents of these records are set forth and explained, I think, in detail in the various reports of the forensic experts that were retained and hired after this verdict came in and prior to sentencing. These records reveal the background of Cooper, which I think is so, so important with respect to this issue. You see, what these records indicate is that Cooper had a lifelong history of neurological, neuropsychological, and cognitive deficits. And as these records, I think, clearly point out, these deficits were attributable to a number of factors. First of all... Counsel, let me ask you this. Sure. In the motion to suppress, didn't his defense counsel state in there that the statement was involuntarily, involuntary was coercive, he had a low IQ, he had ADHD, traumatic brain, birth injury, restricted reading ability, low intellectual function. All that was in the motion to suppress, was it not? That's exactly right. I think that's the point. The point is he raised it, but had all this evidence to support it. And he argued it as well. Well, what he argued, or what he offered at the hearing, among all of those records, was simply the IQ of his client, which I think the stipulation was it was an IQ of 79. Actually, that was contrary to what the experts concluded. But be that as it may, I think the point here is, Justice, that he raises the argument. He files a motion to suppress. In his motion to suppress, he argues or alleges that the statement is involuntary, in part because of these various deficits that he apparently recognized from these records. He has all of these records to support that position. And yet, at the hearing, he offers none of that. You see, in my judgment, an argument rings hollow. When you don't have evidence to support your position, the argument, I think, means nothing to the trier of fact. And I think that is exactly the problem that occurred in this case. Was there any reason to believe the trial court didn't believe what he had in his motion? I don't think the trial court had the option to believe it if it wasn't presented. Well, it was in the motion, though, is what I'm saying. It is, Judge. But I think simply saying it doesn't make it so. And I think it's the failure to do something with these records, which I think is the guts of this argument. I just believe in Illinois here. The authority clearly is that a lawyer has an obligation on behalf of his client. And the obligation is to provide his client with effective representation. And that includes investigation. You see, a lawyer can't make any judgments unless he's informed. And the only way you can make an informed judgment is by conducting some form of investigation. Counsel didn't do that. But you did. Did you not, Mr. Meneker? Pardon me? You did. In your motion for a new trial, you retained Dr. Rabin and world-famous, I think, Dr. Stipes, famous psychiatrists. And Dr. Rabin then gave the Grossi exam. Risseau. Risseau, that's right. You're right. Risseau. And Mr. Cooper scored a 24 when the average score is a 23. Is that right? I think that is correct. But I think... Right. And go ahead. Dr. Stipes then, in his report, asked Mr. Cooper to explain Miranda, as he read a right to explain it. And I suggested, Mr. Meneker, you're an expert in this area yourself. It had happened for decades. I think Mr. Cooper described Miranda rights and what he could do with those rights better than any policeman I've ever heard. So let's assume that, for the sake of this argument, that a trial lawyer had done what you had done. How would you be helped? How would Mr. Cooper's case be helped? By calling as an expert Dr. Rabin, who would testify consistently with this report, he scored a 24 when most people scored a 23. I believe that that is not the full opinion of Dr. Rabin and Dr. Stipes. I think clearly there are, as I understand this Risseau test, there are a number of different levels to it. And one of the levels that these two experts found to be particularly persuasive is the comprehension level. You know, I think they made a point of saying, oh, he could articulate the rights. If you ask him to repeat them, he can repeat them. But does he understand what they mean? And because of what they believed was a severely limited intellectual functioning, he couldn't comprehend the meaning of these rights. Now, addressing your question, how would that have helped? It would seem to me that if Dr. Rabin or Rabin or Dr. Stipes or both had been called to testify at a motion and testified that their conclusion is, based on their evaluation of these reports, based on their independent evaluations of Cooper, and based on comprehensive psychological testing which was performed on Cooper, as well as the Grissel test that you point out, their opinion is that the results of all of those resources was that Cooper could not comprehend the meaning of the rights. And while he could articulate them, he couldn't tell what they meant. And that was the problem. And I also think If that were the case, wouldn't his IQ be below 70? I think his IQ was measured at 66, according to these The record has it at 79. That's all I can look at. This is what I was referring to Justice Connors. That was in 2011, yeah. That was what he stipulated If he couldn't comprehend it, he would be well below 70. He would be below 70, wouldn't he? I don't This is in my field. I'm just throwing out a question. No, it's not my field. But I believe that a limited IQ, I think there's clearly a case law that says a limited IQ is not enough to sustain the fact that a person can't understand them or random words. I believe this was just one component of a number of different components that were considered in rendering or ultimately coming to that opinion. And, you know, had the trial judge, and by the way, the judge who heard the motion was different than the trial judge, but had the judge who heard the suppression motion been provided all of this evidence, I believe that certainly a reasonable probability exists that the outcome of these proceedings or this motion would have been different. Counsel? I'm sorry. Does CRISO meet the FRIE standard? As far as I know, it does. I mean, it has been used before, as I understand, without objection. In fact, there's a case up in Lake County that I believe was used some years ago without objection. All right. And was this defendant BCXed? He was not. No. So, can you infer from that that the lawyer was able to talk to his client about the charges against him and he was able to communicate and discuss with his lawyer the defenses and what was going on at trial? I mean, nobody asked for BCX, right? Nobody asked for BCX because I don't think any lawyer involved in this case had a good faith basis for believing that their client may not be fit for trial. Okay. And he never had any mental health issues. Never hospitalized for mental health issues. Is that right? That is correct. Here's a kid who never hospitalized for mental health issues, but he's born, he's a fetal alcohol child, born to a mother who's abusing alcohol and drugs. So what's the standard for defense counsel? What the doctors decided, both doctors, Raven and what's the other gentleman's name? Stipes. Stipes. That he was mildly mentally retarded. Correct. So every time a defense counsel has a client with that diagnosis, it clicks in, it triggers their responsibility to have these extensive tests done on their client? No, no, not at all. Where I think the requirement comes in is when a lawyer is provided with a stack of records, and these records indicate that they're dealing with a client who, at a bare minimum, has been diagnosed with a traumatic brain injury, which is what these doctors said was the case in this situation. And when you hear that your client has had a traumatic brain injury. Was it traumatic birth injury or birth death? No, no, at birth. At birth, it was a traumatic birth injury. No, no, I'm sorry, maybe I'm misstating. Okay. Shortly after he was born, he was born two and a half months prematurely. Shortly after birth, he has what they call intraventricular bleeding. It's a hemorrhaging of the brain. So it was after his birth. That's right. I think he was in intensive care for three months or more. These factors led to a number of disabilities. Everything from stunted growth, impaired hearing and sight. He had developmental delays. He had a severe learning disorder. He had limited intellectual functioning. But he went to two years of college. On a special education program. You see, please don't think I'm suggesting that simply because the lawyer was aware of a 79 IQ and he didn't have any further responsibility. I think the moral here is, it's what the lawyer becomes aware of. You know, we've all maybe in our experiences represented a client who we may not have felt had any difficulty communicating with us or felt that the client didn't understand what was going on. And then all of a sudden, we come upon a variety of records which suggest, you know, maybe we don't know the end of the story. Maybe there's more to it than that. And that's where I think a lawyer's obligation comes in, to find out what effect do these disabilities and deficits have. That's all. You know, it may very well be that the doctors will say, look, we've reviewed all the records. We've evaluated him. We've given him every test imaginable psychologically. We don't think there's anything there. You know, that's possible. But I think the lawyer has an obligation to make that decision. That's his obligation or her obligation. Mr. Maneker, both Dr. Rabin and Dr. Stipes' reports mentioned in interview, several interviews they had with your client, and both mentioned that he told them, he was badgered throughout the night. One of them said on six occasions and one he told five occasions by the police constantly badgering him to, you know, man up, tell the truth, et cetera. The defendant did not testify at the motion to suppress, did he? He did not. He did testify at trial. He did. And in reading his testimony at trial, at no time did he say, during the five times he was checked on by the police, that he suggested he was being badgered during those five times. Did he? You're talking about the times overnight when he was kept in his cell? Yes. As opposed to later in the morning before the bond hearing, initial bond hearing, when he is being badgered. But during the night, the five times, specifically the five times from the time he's taken in to see his lawyer to the time he's taken down to get out of his jumpsuit, he says he sees the cops five times and he denies being badgered, does he not? He says it was a very short conversation. That's correct. That's my understanding of the record as well. But again, so going back now to Dr. Ruppian and Dr. Stipes' testimony, their reports would have to be, to believe in them, you'd have to believe that what they took from Mr. Cooper was correct, would you not? You've done a lot of psychiatric, have you not, Mr. Ruppian? I'm sure I read your column all the time. And so, you know, I don't want to refer to Mr. Cooper's statements to them as garbage, but, you know, garbage in, garbage out in the county principal, that if he's going to tell the docs, you know, they were yelling at me all night long, gosh, anybody would break down under those circumstances. But then at trial, when he had reason, and his theory of trial was they badgered me in the morning to say man up and do all these things and they'd let me go home if I only admitted molesting my sister. So he had reason to say he had been forced to do it in his trial testimony. But he denied it in his trial testimony. Wouldn't that affect, you would think, Dr. Stipes and Dr. Ruppians? In my judgment, it would not. Because I think what they were looking at was whether he possessed specific faculties to knowingly and confidently waive his Miranda warnings. And the fact that he may not have been badgered all night long, the fact that maybe he understood his Miranda warnings. What's your best case for that, though, to say that that, so where it's not involuntary, I mean, you can argue it's involuntary because they yelled at him or told him, actually even yelling, told him man up the next day. I don't know what we require cops to do these days, but to man up doesn't seem like a lot of burden to Mr. Quinn. What was involuntary of it, other than I'll let you go if you confess to it? Well, let me make this observation, if I might. Hopefully I'll answer your question. I think also we shouldn't lose sight of the chronology in which these Miranda warnings were waived. And I think we've all had experience in police procedure and how this is customarily done. You know, let's start with the premise that we're dealing with a person who has some limited intellectual functioning and all the other things that we've already talked about. Here's what they do. They take the guy out and they sit him down and they say, I want to read your rights to you. You have the following rights. You have a right to a lawyer. You have a right to remain silent. You have a right to have your lawyer here. You have a right to terminate questioning at any time. Now, on paper, on its face, they may have advised him of his rights. But do you think in that chronology there was a concern whether he understood those rights? They don't take them individually. They don't say, look, sir, you have a right to a lawyer. Do you understand what that right means? Well, no. But again, going back to my question, can you cite a case of the proposition that that would provide a basis for this court to suppress the statement or send it back for an internal evidentiary hearing? Has this court or any court review ever said that, that it's a burden on the state not just to show that they read Miranda, not just to say that he acknowledged understanding his rights, but that they had to demonstrate the absolutely understood those rights and that he could act accordingly? I don't think I'm in a position, quite frankly, to cite a case. But I think the cases that I'm aware of all talk about a knowing and understanding waiver of rights. And I think inherent in that proposition is the rights being administered in a manner in which a person, particularly a person of limited intelligence, can understand. So I believe, if I can just wrap up this issue, if I might, by saying, you know, had these doctors testified at this suppression hearing and had they testified to the various disabilities and deficits that they feel this person possesses and the impact these deficits would have had on the admissibility of his confession, specifically because of his inability to waive the Miranda warrants, I think a reasonable probability exists that the outcome of this motion would have been different. And quite frankly, I'll take it to the next level, which I think I have to, frankly, and that is that not only the motion would have been different, I think the outcome of the trial would have been different as well. And I think we start with the premise of our Supreme Court, the value of a confession. I mean, it's incalculable effect on a jury. And if you take this confession out of this case, you know, what you're left with is something that is far from overwhelming. You're dealing with a young woman who uncorroborated testimony regarding the events that allegedly occurred. I certainly concede that a single witness certainly can't sustain a finding of guilt. But I think the witness has to be credible. I think the witness's testimony has to be positive. And I think neither of those factors apply in this case. She was repeatedly impeached. And I think, importantly, the physical evidence that was presented in this case was absolutely inconsistent with her entire version of what occurred here. So I think if you take this confession out of this case, I think you're left with a situation that is far from overwhelming, and I think the outcome of the trial would have been different as well. And I don't mean to abuse my time here, but if I could just comment Go into the motion and eliminate it. Are you going to do the abortion? I'd like to address the abortion. Have I waived it? No, go ahead. I think next to a confession, I think evidence of abortion is probably one of the most persuasive bodies of evidence on a trial of fact. You know, everybody seems to have an opinion one way or the other on this subject. And it's because of strong opinions in this area that courts have recognized the problem with evidence of abortion. And again, one of the cases that Mr. Cooper cited is a case called People v. Murawski. Murawski, this goes back a number of years ago, where the Illinois Supreme Court said, to abortion. Abortion, with all of its involvements, is a fertile field for preconceived notions and prejudices. And it is precisely for that reason that courts are particularly careful about admitting evidence of abortion, even where evidence of abortion is relevant. Do you have any problem with the idea that the judge let in about the pregnancy? No. In fact, in my brief I said I have no, I don't think that was a problem. So what are the results then of pregnancy, right? I'm sorry? I think pregnancy would have corroborated, or they could have argued it corroborated perversion. That's how the police get involved, right? Sure. She goes and sees the doctor. But if you take abortion out of this case, it nets no damage whatsoever to this case. It had absolutely no relevance. But again, it's jurors. And your client chose to try this to a jury, not to a judge. So you have 12 normal citizens off the street, and they'll know, without any argument at all, objection that the little girl, the 12-year-old, is now impregnated, and she's carrying a baby at age 13. Aren't they going to want to know what the heck happened? That's exactly what the state argued at the motion for a new trial. They didn't take that position in their appellate brief, but that's what they argued at the motion for a new trial. And that very argument was rejected in, I think it was, People v. Ellert. Because in Ellert, the state made that argument. They said, Judge. What was Ellert's judgment? Ellert was the case where a woman claimed that she didn't know she was pregnant. Right. Well, that's just radically different. No, no, no, no. But the point was. . . Gave birth in a toilet. No, no. She gave birth and the baby was found in a creek somewhere. Feldman is the one in the toilet. Oh, I'm sorry. But in those cases, or in Ellert, one of the issues raised at the trial court was. . . Well, we have to explain to this jury what was the result of the pregnancy. And the courts rejected that and said, No. That's not an issue in this case. What this jury is concerned about in that regard is really irrelevant. And I submit that is equally applicable here. I think the issue here is. . . What was the purpose of abortion evidence? What was its purpose? If it has no purpose and it carries with it all this baggage that courts have recognized for years. . . How can a young man get a fair trial when evidence like that is presented to a jury? And that is exactly what happened here. You know, the state says, Well, it's relevant because it goes to her state of mind. It explains why she, for years, misled the police and lied to forensic interviewers telling them, Oh, Cooper had nothing to do with this. This was somebody else who did this. I don't. . . Once you concede that pregnancy is a proper and relevant, non-objectionable aspect of this case, which would support multiple rapes as opposed to the one that your client admitted to. I don't really, just speaking for myself, buy into the idea that they'd be so enraged, their average juror would be so taken aback that the 13-year-old did not carry the child to term, that they would hold that more against your client than if the 13-year-old child carried your client's baby to term. I don't. . . I understand exactly where you're coming from. I mean, listen, a pregnancy itself to a 13-year-old girl is not something that's going to enthrall a jury. I'll be the first to acknowledge that. But here's, you know, the fact that this young woman at age 13 was subjected to an abortion, I think that takes it to another level. And I think what that does is it serves to provide sympathy to this woman. Well, how much more sympathy would a 12-year-old girl when she's having sex with the 20-year-old brother need? You know, I don't. . . I don't. . . How high is up? Awfully high, you know. Counsel, can I ask you a question about motion limine versus motion to suppress? Sure. As far as motion limine, was there any objection made at trial to the abortion evidence? Yes. It was. A motion limine was made. I know. A motion limine was made. It was oral motion. No. It was not written. It was an oral motion limine to prohibit evidence of the abortion. Correct. And at trial, when the evidence came in, was that objected to? It was not. It was not. Right. So a motion limine, again, is different than a motion to suppress in that it talks about, you know, evidentiary issues, not constitutional issues, correct? Yes. So on a motion for limine, isn't it waived if you don't make the objection during trial? No. Why not? Because I think that there is a conflict in the law here in Illinois on this point. Yes. The state cites a case, People v. Pantoja. It goes back 20 years ago. This division issued one about two weeks ago. I'm sorry? This division issued one about two weeks ago. Is that right? Well, I hope I'm in accord with what this does. No. No? Well, here's my take on it. Okay. There are, in fact, there are two Supreme Court cases that have recognized that what you need to do to preserve an issue for appeal is to either make a motion in limine or an objection. Either or. As long as you follow it up in a motion for a new trial, you have preserved the issue. The cases in my brief, I think, are Cruzado, Brown, Hudson, and there's a fourth one, Beauclair, that I don't think I cited. Those stand for the proposition I just stated. So I think there's a conflict in the evidence. And I think, quite frankly, he did not waive it based on the holding in these various cases. There's no question in civil trials that you have to make the objection of trial if your motion in limine is denied. No question. That's what the civil law says and the Supreme Court cases state that as well. But in criminal cases, there's a conflict as to whether or not you have to object to trial. But a motion in limine is not a final order. It's not appealable, is it? It is not a final order. Right. So the court can renew or take a look at it again during the trial. Fluid. So wouldn't that suggest to me, strongly, that a court can reconsider that and the objection should be made at trial when the abortion evidence came in. Counsel should have made that objection to trial in order to preserve that issue, don't you think? Well, I agree with the premise that a motion in limine is fluid. But I think in these circumstances, this court entered an order, essentially, that he's going to allow evidence of abortion. I think his ruling was such that it may not have been appealable, but I think it was about as final as it could be. Well, I have to tell you, the Hudson case is so interesting to me. It's interlocutory. It's interlocutory, right. Because I love the facts of this case. Defense counsel sought a motion in limine to keep the state from referring to the defendant's relationship with Richard Speck. I mean, that's the basis of these cases, the Hudson case. And to say that that's precedent, obviously it is. It's a Supreme Court case. But that we're relying on that to say from now on, no one needs to, you don't need to, as far as when a motion in limine is granted or denied or whatever, you don't have to object again at trial. I mean, I just think that. Well, maybe what you're saying is a fact-specific issue. Quite possibly. The way I read these cases, I don't think it is fact-specific. Well, I'm just saying the basis of what has come down from the Supreme Court was maybe fact-specific. I don't argue that it is fact-specific. But I don't think the court in that case said, based on the facts we have here, I think the record has been preserved. I think what they said in Hudson was, in order to preserve an issue on appeal, we hold that a defendant either must make a motion in limine or file an objection at trial and raise it in a motion for a new trial, which I think supports my position, although I'm afraid it may have hit a wall with a couple of weeks ago, but that's my view. Or let me take it a different way. Assuming I'm wrong, I think plain error. I'll ask that it be considered as plain error, again, citing the less than overwhelming nature of the evidence. I don't mean to make light of this. I think this abortion issue was a very, very difficult issue. I think it netted no damage to the State's case if it had not been disallowed. I think the court clearly abused his discretion in allowing it. And for those reasons and all the other reasons that I've cited, I would ask that Your Honors consider reversing Mr. Cooper's conviction. Thank you for the time. Thank you, sir. May it please the Court. Again, for the record, Assistant State's Attorney in California, on behalf of the people. The defendant here did not receive an effective assistance of counsel. A review of trial counsel's entire performance shows that he was anything but deficient and that even if certain deficiencies existed, they certainly would not have changed the outcome of either the motion or the trial. Specifically in regards to the defendant's motion to suppress statements, the defendant did not receive an effective assistance of counsel. Here, the defendant cannot overcome that counsel's decisions were strategic. We have here a defendant who was not mentally retarded, and the record clearly rebuts the defendant did not understand his Miranda rights. Counsel's strategy and what he argued was that the defendant was coerced into making a statement by the police officers. The argument that counsel believed in his professional opinion was winnable as opposed to focusing on the defendant's intellectual shortcomings. He presented this coercion claim thoroughly. It was valid trial strategy. And in addition to this coercion claim, he did also present evidence regarding the defendant's low IQ and argued that the coercion, in addition to the defendant's low IQ, produced an involuntary statement. The fact that appellate counsel now might argue that he would have done things differently or introduced different sort of evidence certainly does not rise to the level of finding trial counsel constitutionally deficient. It's also well established that the mental capacity of a defendant is only one factor to consider in the totality of the circumstances when considering whether the defendant waived his rights. And this Court has ruled that defendants with IQs much lower than the defendant's, the defendant's IQ during the motion was a 79. Defendants with IQs of 62, 54, 76 have all found to have made knowing and intelligent waivers. And clearly the trial court also felt the same way. The trial court was presented with this very same argument in a post-trial motion. And the trial court, even after having reviewed Dr. Stipes' and Dr. Rabin's evaluations of the defendant, found that despite the evidence of the defendant's low IQ, and even if they would have been presented with these evaluations, there is not a reasonable probability that existed that the outcome of the motion would have been different. It's bare speculation on the defendant's part to assume that counsel did not investigate and did not consult any doctors. This is not supported by the record. It's possible that counsel did investigate, did consult with doctors, and decided that after speaking with them that he was not going to pursue that specific avenue. Dr. Stipes' evaluation, as Your Honor indicated earlier, clearly indicates the defendant was able to articulate his Miranda rights. And the defendant's additional claim that counsel was ineffective for failing to properly present evidence regarding the defendant's low IQ, regarding the defendant's learning disability, ADHD, that was all evidence that was presented at the motion. Counsel did present evidence of the defendant's impaired intellectual functioning. He proceeded with the motion and advocated on behalf of his client on claims that he felt were winnable in his professional opinion. His strategy was reasonable, and the fact that he chose to pursue a different primary avenue and not focus as the primary avenue, the defendant's low intellectual functioning certainly did not constitute ineffective assistance of counsel under Strickland. In addition to that, counsel also presented not only defendant's IQ at the motion, but also at trial. And it's purely speculative what exactly the result or what impact the defendant's cognitive deficits would have had and how they would have affected his ability to understand Miranda. It's pure speculation. But even if this Court finds that counsel's decisions were not trial strategy, the defendant has still failed to prove that a reasonable probability exists that the outcome of the motion would have been different or the outcome of the trial would have been different had the defendant's statement been suppressed. At trial, it's very clear that the defendant testified in a coherent manner. He was responsive to the questions from both his attorney as well as from the state. He showed that he had the mental capability of understanding these complex questions. He answered back in a coherent and appropriate manner despite his cognitive deficits. In addition to that, the defendant was able to recount events that occurred from years prior without any difficulty, again indicating that he was able to understand everything that was transpiring. The trial court also noted in its ruling in the post-trial motion that the evidence of the defendant's limited IQ did not indicate the defendant was incapable of not understanding his Miranda rights. And also the court noted that it looked at the totality of the circumstances when it made the decision and ruled that the defendant had knowingly and intelligently waived his rights. In addition, Your Honors, to all the evidence that was presented, even without the defendant's statement, there was certainly enough evidence in this case that was presented by the people. The victim testified at trial. I won't belabor the details. I'm sure you're aware of them. But from five years of age, the sexual abuse began when the defendant started inserting his fingers into her vagina. It culminated to the age of 12, 13 years old, where he began sexually abusing her by inserting his penis into her vagina, and it ended up with her getting pregnant. And certainly the testimony alone of this victim, her testimony was found to be credible. The jury was presented without various inconsistencies that she had indicated to the police, to the first VSI, to a friend, Caitlin, in the letter that she had indicated, all revealing that the victim on several occasions had indicated that someone other than the defendant had sexually assaulted her, and that's how she had gotten pregnant. Yet the jury chose to find her credible, chose to accept these inconsistencies, and chose to convict. And when viewing trial counsel's performance as a whole, it is very clear that he was anything but deficient. Including evidence of an abortion, didn't that have the effect of throwing gas on the fire? It did not, Your Honor. Preliminarily I note that this issue has been forfeited for the purposes of appellate review. In addition to the arguments that have already been made, one very important point to note is that in the motion in Limine, the abortion evidence was objected to because it was hearsay. There was never any argument made that the abortion evidence should not be introduced because it was prejudicial. The prejudicial component of the abortion argument, the first time that was ever introduced was during post-trial motions. Therefore, it is not an issue that has been properly preserved, and it has been forfeited for the purposes of appellate review. But beyond the forfeiture issue, it wasn't putting gas on the fire. The abortion was part and parcel of this specific offense. It was relevant to show the victim's state of mind and to also show the reasons why she delayed in her outcry, why she gave the different versions that she gave regarding who exactly had sexually assaulted her to the police during the first VSI to her friend Caitlin. And more importantly, and in contrast to the cases that defendant cites to Feldman and Allert, in those cases the prior pregnancies and abortions involved the defendant, not the victim as in the case that we have here. And also very importantly, those prior pregnancies and abortions in those other cases were used essentially for propensity purposes. And they involved events that had nothing to do with the charges that were pending before the court in those cases. In contrast here, the pregnancy and the abortion had everything to do with the charges that were pending before the court. They were part of the case. They were the case. So certainly major distinctions can be made in regards to Feldman and Allert and how those cases are not at all comparable to the instant case. Counsel, did you say the only basis for the motion eliminating the abortion issue was hearsay? Yes, Your Honor. It was the only issue. That was the only objection that was made as to the evidence coming in. Yes, it was based on hearsay. Going back to Mr. Meneker's point, though, if you take out the defendant's confession in this case, it really is a he said, she said, is it not? Because there's no other physical evidence other than she had a pregnancy, so obviously she had sex with somebody. There's no physical evidence to tie him to this incident other than her own testimony. Is that right? That's correct, Your Honor. Certainly physical evidence is not required in order to convict. And in addition to that, RC, the victim, did testify in a credible manner. She testified how the abuse transpired from the beginning to the very end, including the abortion. Her testimony was found to be credible. Even when presented, the jury was presented with the various versions that she gave, and the jury found her to be credible, believed her, and found that there was enough evidence to convict. Now, one of the pieces of evidence was this letter. Is that right? To Caitlin, yes. A letter that she's writing as she's crying and that attracts the teacher's attention, which then attracts the police's attention. The judge left out the third proposition. Did he not? Meaning that he did not allow the defense to argue in the instruction, the 11510 instruction, that they could consider that for the truth of the matter, for its actually not just impeachment, but its substantive evidence. That's correct, Your Honor. And in our brief, we did argue that the trial court properly excluded that second paragraph in IPI 3.11 because we do believe that it should have been included for impeachment purposes, as opposed to substantive evidence. However, whether it was introduced to the jury as either for impeachment or as substantive evidence, in my opinion, it is irrelevant because it would not have changed the outcome of the case. Again, the jury was aware of the many different versions that were presented by the victim and how she repeatedly, on many occasions, indicated that someone other than the defendant had sexually exalted her, and that's how she had gotten pregnant. Yet the jury chose to believe the victim, accepted her inconsistencies, and found her to be credible and enough to convict. So whether the evidence would have come in as substantive or for impeachment purposes only, it certainly would not have changed the outcome of the case. And even if this court were to find that the court erred on that specific issue, it was certainly harmless were the jury was properly instructed otherwise. But going back to the abortion issue, I also wanted to note that, again, not only was the abortion issue relevant in part and parcel to this case, but it was also very important to explain to the jury. And as Your Honor noted earlier, the jury would have been left with open-ended questions. What happened to this pregnancy? What happened to this child? So it was necessary in order to explain. And certainly we can't sanitize an offense or a crime in order to suit the defendant. And here there was a conspiracy that was transpiring in this home. Patricia, the mother, was aware that the sexual abuse was going on, and she did everything in her power to cover up this crime. And she did that right after R.C. had an abortion. R.C. began being homeschooled, and she began being homeschooled for the purpose of her not being exposed to the outside world so as to continue to cover up this criminal activity and to immunize the defendant from prosecution. Was that argued in front of the jury that the homeschooling was the result of this evil-motived mother of the defendant? I don't believe it was argued in front of the jury, no, Your Honor. It's not argued here. That ship has sailed. Because, frankly, it doesn't make any sense. But she did indeed threaten the victim. She certainly did on several occasions told R.C. that if she did tell the truth, that she would go to a shelter or a foster home. This is the only home that R.C. knew from an infant. R.C. was adopted by Patricia and her husband as an infant, and certainly as R.C. testified that this was something that she was very fearful, to have to leave her home and end up somewhere where she would not essentially have a home. More importantly, the defendant has failed to prove here that the prejudicial impact substantially outweighed any probative value in regards to the abortion issue. Here it was hugely probative. It was extremely relevant in order to prove the victim's state of mind. And as counsel has conceded, and at trial, and on appeal, the pregnancy evidence was never an issue that was contested. It was never an issue that was complained of. And truly, the pregnancy as well as the abortion are part and parcel of this offense. They specifically pertain to the exact charges that were pending against the defendant, and that's why they were properly admitted. Counsel also argued in the brief, the defendant argued in the brief, that it was presented in a way to the jury as to make it seem it was a material issue. And I respectfully submit that that was not the case. It was discussed briefly in the victim's direct examination. It was, again, brought up in the people's open-close argument as a way just to explain a timeline of exactly what occurred in this case, very briefly once mentioned in open-close. And it was, again, briefly discussed in the people's rebuttal argument, and that was done specifically to rebut certain arguments that were made in the defendant's closing argument. During closing argument, the defendant argued that the people had not proven that the victim was pregnant or had undergone an abortion. So it was necessary for the prosecutor on rebuttal argument to remind the jury of the evidence and to let them know that there was sufficient evidence that was presented to them in order to convict. It was certainly not intended to evoke any sort of sympathy from the jury. Counsel, on the probative or prejudicial effect of pregnancy versus abortion, what's your opinion on that? Do they have the same effect, similar effect? Counsel argues it's much more emotional to discuss abortion. I don't think, I think they're both on the same level, essentially. And I also believe that here I don't really see how the abortion would have really, or would have prejudiced the defendant because it was made very clear through the testimony  he wasn't the one who took her to get the abortion, he wasn't the one who decided that she should get an abortion. So he wasn't even the person who was responsible for that. So that's like another, essentially, layer or argument as to how this can't possibly be prejudicial toward him. But I do believe that they're on the same level, on the same playing field here. But when you say responsible, you're talking about responsible for getting the abortion, not for having the need for the abortion, which was the pregnancy. I'm sorry, I don't think I understand. I think you said he wasn't the one responsible for the actual... For the actual getting the abortion, yes. Certainly he was the cause of it, yes. I also just wanted to briefly argue that even if this Court were to find that the abortion evidence was prejudicial or that it was irrelevant, it certainly did not deprive the defendant of a fair trial, where here the evidence against him was overwhelming. As I indicated earlier, the testimony of the victim alone is enough to convict. Here we had the testimony of Detective Mulek, of Detective Caldwell, and very importantly, the defendant's confession, which all was overwhelming evidence against the defendant. The pregnancy, the abortion were relevant. They were certainly not central issues in the case. They were not material factors in the defendant's conviction. And we ask that you affirm the defendant's convictions. Thank you. Well, don't lead with your chin. Just come in here and do your thing. We'll stop you when the time comes. I'm going to address the expression you raised just a moment ago. You talked about gas on the fire. Did this abortion evidence put gas on the fire? Let me tell you exactly how it put gas on this fire. You know, counsel talked about the opening comments of the prosecutor in his opening close. Here's the comment the prosecutor makes. This young lady began having sexual intercourse when she was 12 years old, about a year before she had to have an abortion. Now, getting to your question, Justice Connors, is there a difference between abortion and pregnancy? Well, maybe if she said maybe a year before she got pregnant, it would have been one thing. But that was a gratuitous comment, a gratuitous comment for nothing. You didn't have to set a timeline using the abortion as a frame of reference. The statement was pretty direct. Intercourse began at age 12. You don't have to refer it to a year before an abortion. This was used solely for the purpose of arousing sympathy for the complaining witness. And I think at the same time it generated nothing but contempt because of what this young girl went through. And as you point out, the state's prosecution being that he was responsible for the conduct that this young girl went through. That led to the abortion. It was not relevant. The state of mind, my goodness, all the way through this trial, the young lady said, here's why I didn't tell the truth to the police, here's why I didn't tell the forensic investigators that Cooper was involved, because of what my mom told me. My mom told me if I accuse Cooper, then I'm going to wind up back in a shelter and at my age I'm probably not going to be adopted again. That's why I wasn't forthcoming. This abortion had absolutely nothing to do with that young woman's state of mind with respect to how they're arguing. It had everything to do with why she was not candid with law enforcement. This whole notion of abortion, as I said before, if you strip it from this case, it would have done no damage whatsoever to this prosecution. No damage whatsoever. And as counsel pointed out, it didn't even involve Cooper. He wasn't the one who was instrumental in the abortion itself. He wasn't the one who forced her to get an abortion. It had nothing to do with him. And if they feel that the mom was responsible for this, she's not on trial. But they have to put in, any rational trial would put in the actions of the mother, right, to explain why the little girl won't want to, when you're threatening to throw a 13-year-old into a shelter. Well, no, I agree with that. And let me just, if I might, the winnable strategy argument. You know, strategy is winnable, or you think it's winnable. If you're unaware of any other possible strategy, that may be more winnable. And if you don't do any investigation, if you don't look into what's involved in all these records, if you don't pursue that avenue, obviously anything looks more winnable. And that is what, why I believe this argument lacks merit. You know, to say, well, he chose the more winnable argument. Sure did, because he wasn't informed, because he didn't do what I think he had a responsibility to do. And that's why I think it was a more winnable argument. And I think counsel said, and I'll wrap it up with this, well, the judge concluded there wasn't a reasonable probability. First of all, as I pointed out earlier, that wasn't the judge who heard the motion. Now, it is true that the judge did hear the defendant testify, and a judge certainly can say, based on my observations of the defendant, I think he was capable of waiving his Miranda rights and so forth. But what this judge said in that finding was he said, I watched the defendant testify. I think he did answer questions properly. I think he was composed on the witness stand. And quite frankly, I don't think an IQ of 79 is necessarily enough to show that he didn't understand Miranda. Well, my response to that is I think the court was in error. I think either the court wasn't familiar enough with the records, because what he said was, well, I don't find, based on what I saw in this courtroom, that the defendant was mentally retarded. That is absolutely contrary to what these two experts said. Did he actually say mentally retarded? No, the judge said, oh, he's mentally retarded. I'm sorry. The judge said, I saw him testify. He's not mentally retarded. See, I don't know if it's an unfamiliarity with reading the records. I don't know if he misspoke. I'm not sure. But he also said something to the effect of, well, the only thing presented here was an IQ of 79. That wasn't what was presented at the motion for new trial. We had all these records and these reports and everything else that he could have considered. So simply because the trial judge felt there wasn't a reasonable probability I don't think is a determinative factor. And with that, I appreciate it. Thank you very much. Thank you very much for your excellent oral arguments on both sides. This matter is being taken under advisement. We stand adjourned.